**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DARNELL PARKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 11 C 00192** |
| | ) | |
| **ILLINOIS DEPARTMENT OF** | ) | |
| **TRANSPORTATION, et al.,** | ) | **Judge John J. Tharp, Jr.** |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Darnell Parker filed this action against the Illinois Department of Transportation ("IDOT") and IDOT employees Charles Klemz, Giovanni Fulgenzi, and Robin Thorpe, alleging claims of racial discrimination and retaliation pursuant to Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, Section 1983 of the Civil Rights Act of 1964, 42 U.S.C. § 1983, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* and hostile work environment pursuant to Title VII. The counts founded on §§ 1981 and 1983 were previously dismissed as to IDOT; the Title VII claims were dismissed as to the individual defendants. ECF No. 33. Now before the Court is the defendants' motion for summary judgment. For the reasons set forth below, the defendants' motion is granted in its entirety.

## I. BACKGROUND

### A. The Plaintiff's Local Rule 56.1(b)(3) Response and Statement of Additional Facts

As an initial matter, the Court must address the plaintiff's compliance with Northern District of Illinois Local Rule 56.1, which provides litigants with instructions and procedures for properly filing and responding to motions for summary judgment. Pursuant to Local Rule 56.1(a), a party seeking summary judgment must file with its motion "a statement of material

facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." N.D. Ill. L.R. 56.1(a)(3). For its part, the defendants properly filed a "Local Rule 56.1(a)(3) Statement of Uncontested Facts," *see* ECF No. 61, "consist[ing] of short numbered paragraphs" setting forth the "material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." N.D. Ill. L.R. 56.1(a).

A party opposing summary judgment must comply with Local Rule 56.1(b), which requires:

> a concise response to the movant's statement that shall contain … a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and … a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon.

N.D. Ill. L.R. 56.1(b)(3)(A)-(C). As the defendants correctly point out, the plaintiff has failed to comply with the requirements of the Local Rules.

Specifically, instead of responding to the defendants' statements of material fact in concise numbered paragraphs, the plaintiff submitted a combined statement that purports both to respond to certain paragraphs of the defendants' Rule 56.1(a) statement and to set forth the additional facts on which the plaintiff relies pursuant to Rule 56.1(b)(C). After stating that he "agrees with a majority of the facts presented by Defendant," the plaintiff's submission states that facts contained in paragraphs 14, 25, 27, 33, 39, 43, 53, 58, 59, 63, 64, 65, 66, 70, 71, 74 & 77 of the defendants' statement "are in dispute or incomplete." Pl.'s 56.1 Resp. ¶ 5, ECF No. 66. The remainder of the plaintiff's brief contains statements of additional fact that, in some instances, purport to deny the veracity of some of the defendants' facts, and which are organized

2

not in paragraphs that correspond to those in the defendants' statement but are grouped by witness. *Id.* at ¶¶ 6-64.[1]

This is not how summary judgment motions are required to be contested in this district. *See, e.g., Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 644 (7th Cir. 2008) (disregarding the plaintiff's 56.1 statement of facts which contained "long, argumentative paragraphs … [which] simultaneously denied the veracity of [defendant's] proposed material facts and presented additional facts of his own"). District courts are "entitled to expect strict compliance with [Local] Rule 56.1." *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000); *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 922 (7th Cir. 1994)). As the Seventh Circuit has noted, even "[s]ubstantial compliance is not strict compliance." *Id*. And more to the point, district courts are not required to "wade through improper denials and legal argument in search of a genuinely disputed fact." *Smith v. Lamz et al.*, 321 F.3d 680, 683 (7th Cir. 2003) (quoting *Bordelon,* 233 F.3d at 529).

For these reasons, the Court declines to consider the plaintiff's combination statement of facts. The defendants' facts are therefore deemed admitted to the extent they are supported by admissible record evidence and the facts asserted by the plaintiff are disregarded. *See, e.g. Ciomber*, 527 F.3d at 643 (affirming district court's refusal to consider the facts proposed by the

---

[1] The Court notes as well that several facts that the plaintiff's statement purports to dispute do not actually appear to be disputed in the plaintiff's statement (or at least are not identified as facts in dispute). Specifically, the Court found no specific reference to defendants' facts 25, 43, 59, and 71. Other facts asserted by defendants that are disputed in the plaintiff's statement (*e.g.*, number 69) were not identified as facts in dispute at the outset of the plaintiff's statement. Avoiding confusion of this sort is precisely the reason that Local Rule 56.1 requires the party opposing summary judgment to submit "a response to each numbered paragraph in the moving party's statement."

plaintiff's Rule 56.1 response because he did not separate his proposed facts from his responses to defendant's proposed material facts); *Ammons*, 368 F.3d at 817 (affirming striking down of all responses that did not comply with Local Rule 56.1); *see also Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 809-10 (7th Cir. 2005) ("A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed." (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995))).

As required on a motion for summary judgment, the Court still views the defendants' admitted facts in the light most favorable to Parker, the nonmoving party, and draws all reasonable inferences in Parker's favor. *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997). Accordingly, the following factual background is drawn from the defendants' Local Rule 56.1 statements of fact. *See* Defs.' 56.1 Stmt., ECF No. 61.

### B. Facts

#### 1. *Parker's Employment with IDOT*

Parker, an African American man, veteran, and resident of Merillville, Indiana, was employed by IDOT between 2007 and 2010. Am. Compl. ¶¶ 6, 8, ECF No. 6; Defs.' 56.1 Stmt. ¶ 1. IDOT maintains Illinois's highways and employs Highway Maintainers and Emergency Traffic Patrol ("ETP") workers at several maintenance facilities, or "yards," throughout the State to accomplish that task. *Id.* at ¶ 5. "Highway Maintainers are responsible for plowing roadways, patching potholes, clearing roadways of litter, and maintaining the yard at which they work." *Id.* at ¶ 6. ETP drivers "keep traffic flowing" by "chang[ing] flat tires, remov[ing] stranded vehicles and attend[ing] to motorists that have accidents." *Id.* During the winter season, IDOT also

employs seasonal employees, commonly referred to as "snowbirds," to assist with snow and ice removal in addition to performing some of the other duties of a Highway Maintainer. *Id.*

Between 2007 and 2009, IDOT employed Parker as a "snowbird" while Parker continued to work as a truck driver for K-Five Construction. *Id.* at ¶ 8. Unlike some other positions at IDOT, "snowbirds" are not required to be residents of Illinois. *Id.* On October 5, 2009, Parker completed an application for permanent, full-time employment with IDOT as a Highway Maintainer. *Id.* at ¶ 9. As part of that application process, candidates are required to take a test administered by Central Management Services ("CMS"), and then are placed on an eligibility list, lettered "A," "B," or "C," that corresponds with their test scores. *Id.* at ¶ 7. Veterans, like Parker, receive extra points on the test and have absolute preference to be hired over non-veterans on each list. *Id.*

Parker received an "A" grade. *Id.* at ¶ 9. After interviewing with Defendant Fulgenzi, the Personnel Service Manager of IDOT's District One, Parker was hired as a full-time Highway Maintainer on December 4, 2009. *Id.* at ¶¶ 2, 9. However, IDOT hired Parker into the Highway Maintainer position on a probationary basis. *Id.* at ¶¶ 9-10. Parker's permanent employment in that position was contingent on approval by CMS, which, Fulgenzi testified, may lag behind IDOT's initial offer of employment. *Id.* at ¶ 10.

Parker started in the Highway Maintainer position on December 16, 2009. *Id.* at ¶ 11. He was assigned to the Dan Ryan Yard, where his duties remained the same as those of a "snowbird." *Id.* In late February of 2010, however, CMS informed IDOT that they would not approve Parker's hiring as a Highway Maintainer because Parker was not an Illinois resident. *Id.* at ¶ 13. CMS explained that Highway Maintainer positions are subject to CMS's Personnel Code which provides, in part, that:

> No person who is a non-resident of the State of Illinois may be appointed from [the] eligible list [of applicants] unless the requirement that applicants be residents of the State of Illinois is waived by the Director of CMS and unless there are less than 3 Illinois residents available for appointment from the appropriate eligible list.

*Id.* at ¶ 17 (citing 20 ILCS 415/8b.1). IDOT attempted to obtain a waiver for Parker from CMS, but those requests were denied. *Id.* at ¶ 14.

Apparently unaware that CMS would not approve his hiring, Parker submitted his resignation to K-Five Construction on May 25, 2010. *Id.* at ¶ 12. Shortly thereafter, on June 9, 2010, Defendants Fulgenzi and Klemz, the Administrative Services Manager at IDOT's District One, met with Parker to explain to him that CMS would not approve his hire as a Highway Maintainer because he was not a resident of Illinois and that his employment would be terminated that day ("June 9 meeting"). *Id.* at ¶¶ 2, 15. The defendants also provided Parker with a letter dated June 9, 2010, from Matthew Hughes, IDOT's Bureau Chief of Personnel Management, which stated that "Highway Maintainer positions are covered by the [CMS] Personnel Code. As such, CMS has the final decision on transactions for this title," and that CMS "would not approve the transaction to hire [Parker] because [he was] an Indiana resident." *Id.* at ¶ 16. Hughes further explained that in Parker's case, "there were more than 3 Illinois residents available for appointment with an A grade on the veteran list … [and] [b]ecause of this, CMS ha[d] informed IDOT that they [could not] certify [Parker] and [therefore his] employment with IDOT [would] be terminated immediately." *Id.* at 17. At his deposition, Parker testified that at the time he did not believe his termination from the Highway Maintainer position was based on his race, and he did not file a charge with the Equal Employment Opportunity Commission ("EEOC"). *Id.* at ¶ 18.

During the June 9 meeting, Klemz proposed that Parker accept a 60-day emergency hire position as an Engineer Tech III ("ETIII") assigned to be the "gas man" at the ETP facility

located at 3501 South Normal, Chicago, Illinois. *Id.* at ¶ 20. Parker accepted this emergency hire position, which did not require him to be an Illinois resident. *Id.* Neither Klemz nor Fulgenzi were required to offer Parker the ETIII position, but did so to assist him and prevent him from missing a paycheck. *Id.* at 21. At his deposition, Klemz also testified that he put Parker at the ETP facility because it was closer to Indiana than the other available options and there were no positions available at the Dan Ryan Yard, where Parker worked previously. *Id.* at ¶ 21. In affidavits, Klemz and Fulgenzi aver that they have never offered an ETIII position to any other IDOT employee who was terminated from a Highway Maintainer position. *Id.* at ¶ 22. Because the ETIII position was temporary, it did not come with benefits. *Id.* at ¶ 23. As a result, Parker lost the benefits he had accumulated while a Highway Maintainer. *Id.* That said, if not for the emergency hire arranged by Defendants Klemz and Fulgenzi, Parker would not have had a position at IDOT; instead, he continued his employment at the same salary. *Id.* at ¶ 21.

Klemz and Fulgenzi instructed Parker to report to Michael Schivarelli, the Operations Manager at the 3501 South Normal ETP facility. *Id.* at ¶ 25. Schivarelli explained to Parker that, as the "gas man," any of the "lead" workers at the facility had authority over him and could give him assignments. *Id.* At his deposition, Schivarelli testified that the duties of a "gas man" were to pump gas, wash equipment, sweep and clean the facility, fill sandbags, and other related duties around the yard. *Id.* at ¶ 27. Darrin Monroe, an ETP driver, also testified that on occasions when he filled in as the "gas man" his duties included washing trucks, taking out trash, filling sandbags, picking up trash, and answering the phone. *Id.* at ¶ 28. These duties are consistent with the duties that Parker reported that he was responsible for as an ETIII assigned to the ETP facility, which included fueling and washing trucks, cleaning and washing garage floors, picking up trash around the building, filling sandbags, and minor painting. *Id.* at ¶ 29.

In order to continue Parker's employment with IDOT beyond the 60-day emergency hire, Klemz created a Technical Manager II ("TMII") position. *Id.* at ¶ 30. Though different in name, the duties of this position were the same as the duties Parker was performing as an EMIII "gas man." *Id.* at ¶ 31. According to Klemz and Fulgenzi (and Parker does not dispute them), this is the only position they could create for Parker, but it had the advantages of providing full-time employment while not requiring Parker to be an Illinois resident and allowing him to receive medical insurance. *Id.* at ¶ 30. The salary for the TMII position was about the same as Parker had received as a Highway Maintainer and as an EMIII. *Id.* at ¶ 35. Parker had to submit an application for the position, but was not required to take a test or go through an interview.[2] *Id.* at ¶ 34. In his application, Parker indicated that he had been terminated from the Highway Maintainer position in June 2010 because he lived in Indiana. *Id.* at ¶ 36.

For reasons that the record does not fully explain, when Parker was transferred to the EMIII position as a non-permanent employee, his membership changed from Local 700 to Local 916, and he remained in Local 916 thereafter. *Id.* at ¶¶ 37, 39. The "gas man" position to which he was assigned, however, was a Local 700 position, as were all of the Highway Maintainer and ETP driver positions at the ETP facility. *Id.* at ¶ 30. After Parker had become an EMIII, and eventually a TMII, he began to complain about his responsibilities and the manner in which he was treated by the ETP drivers and Highway Maintainers at the ETP facility. Specifically, Parker

---

[2] The TMII position was "double-exempt"—meaning that the position was exempt from both the Personnel Code and the *Rutan* interview process. *Id.* at ¶ 33. As the defendants explain in their brief, a *Rutan* interview is a type of interview process that was implemented pursuant to the Supreme Court decision in *Rutan v. Ill. Republican Party,* 497 U.S. 61 (1990), meant to limit hiring decisions to neutral rankings, as opposed to political affiliation. Defs.' 56.1 Stmt. 8 n.1; *see also Rutan,* 497 U.S. at 62 (holding that promotions based on political affiliation or support violate public employees' First Amendment rights). "Double-exempt" positions are also at-will, meaning that employees in those positions can be terminated for any or no reason, so long as that reason is not illegal. *Id.*

complained that he had a separate sign-in sheet, needed supervisor approval to leave, was not allowed to eat in the break room, was not given a locker, and was required to clean the facility and wash management's state cars and drive to get coffee and doughnuts,. *Id.* at ¶ 38-39.

Parker's major complaint, however, concerned the limited amount of overtime that he received as a "gas man" at the ETP facility. Before Parker's assignment as a "gas man," ETP drivers filled the position on a rotating basis, including during overtime periods. *Id.* at ¶ 41. When Parker arrived as a "gas man," however, conflicts arose concerning the assignment of overtime hours (which paid time and a half or double time, depending on the circumstances) for the gas man position. *Id.* at ¶ 41-42. Parker complained that he should be getting the overtime hours on the gas pump. *Id.* at 53. On September 7, 2010, Schivarelli sent an email to Klemz, Fulgenzi, and Steve Travia, the Bureau Chief of Traffic for IDOT's District One, indicating that Parker was not happy with the number of overtime hours that he was receiving. *Id.* at ¶ 42. In the email, Schivarelli explained that he had had several meetings with Parker to explain the overtime process, but that Parker remained unhappy with the overtime assignments. *Id.*

The next day, on September 8, 2010, Parker met with Klemz and Don Chiarugi, a Division Representative for the Teamsters Local 916 union, to discuss Parker's belief that he should be receiving all of the available overtime on the gas pump. *Id.* at ¶ 44. Klemz explained to Parker that they would try to get him as much overtime as they could. *Id.* However, because Parker was assigned to a Teamster Local 700 position, preference had to be given to Local 700 union members. *Id.*

The following week, on September 15, 2010, Dennis Willis, the ETP storekeeper, submitted a memorandum to his supervisors, Schivarelli and Foley, indicating that on the morning of September 14, 2010, Parker told Willis that he "should leave early." *Id.* at ¶ 45. At

the time, Willis observed that Parker was wearing camouflage fatigues, but did not see that Parker had any weapons. *Id.* Willis told Parker that "whatever he planned he should re-think." *Id.* Willis informed Erasmus Berrios, a Lead Worker at the ETP facility, about the incident the next day. *Id.* Berrios advised defendant Thorpe, another Lead Worker at the ETP facility, about Parker's comment; Thorpe, in turn, advised Berrios that Schivarelli and Foley should be told about the comment. *Id.* at 46. Berrios submitted a memorandum to Schivarelli and Foley stating that Willis reported that Parker told Willis to leave work "because something was going to happen" that day. *Id.*

Defendant Thorpe also submitted a statement to Schivarelli and Foley indicating that he had learned that Parker told Willis to "go home early today because something is about to happen and there is about to be a war in here." *Id.* at ¶ 47. Thorpe was particularly concerned about the statement because, as he admitted, he and Parker were not on the best of terms and Thorpe believed Parker's statement was directed at him. *Id.* Thorpe stated that he thought the statements were a "very serious threat." *Id.*

Schivarelli submitted a letter to Klemz and Fulgenzi on September 15 as well. *Id.* at ¶ 48. Schivarelli indicated that Parker's statement, in combination with the fact that Parker was wearing fatigues during the two days prior to making the statement, was a concern. *Id.* Schivarelli also noted that since Parker's meeting with Klemz on September 7, Parker had taken a day and a half off from work and had been keeping to himself. *Id.* at ¶ 49. Foley submitted a similar letter which stated that "Management has taken this incident as something potentially serious especially since…Parker has recently been wearing Army Camouflage Clothing to work." *Id.* at ¶ 50. Foley also indicated that Parker continued to complain about the amount of overtime he was receiving. *Id.* at ¶ 52.

Based on these reports and after discussing the issue with Klemz, Fulgenzi determined that Parker's employment should be terminated. *Id.* at ¶¶ 53, 55. On September 21, 2010, Schivarelli handed Parker a letter informing him that he was being terminated that day because his services were no longer needed. *Id.* at ¶ 54.

### 2. *Parker's Internal Complaints to IDOT*

During his employment with IDOT, Parker contends that he completed and submitted two "Internal Discrimination/Harassment Complaint" forms, one signed on September 7, 2010, and the other signed on September 21, 2010, the day that Parker was terminated. *Id.* at ¶ 60. On the September 7 complaint form, Parker checked "Unequal Pay" and "Harassment" as the issues on which the complaint was based. *Id.* (citing September 7, 2010 Internal Complaint, Defs.' 56.1 Stmt., Ex. 30 at 1). Parker specified that the basis of his complaint was that Thorpe (who is also African-American) had called him "a bitch" on three occasions. *Id.* On the September 21 complaint form, Parker checked "Retaliation" and "Discharge" as issues. *Id.* (citing September 21 Internal Complaint, Defs.' 56.1 Stmt., Ex. 30 at 2). On that complaint form, Parker specified that he had been retaliated against for filing his September 7 complaint against Thorpe and that he had been working in a different job title than he was assigned, making less income than he expected. *Id.* A review of both complaint forms shows that Parker did not check "Race" on either form as a basis for the harassment or discrimination about which he was complaining. *See id.* at ¶ 65; *see also* Internal Harassment/Discrimination Complaints, Defs.' 56.1 Stmt., Ex. 30 at 1-2.

Parker also submitted a letter on September 7, 2010 to the Teamsters Local 916 union concerning Thorpe's cancellation of his overtime on one occasion. Defs.' 56.1 Stmt. ¶ 61. The letter says nothing whatsoever about racial discrimination. Parker faxed this letter and his internal complaints to IDOT's Bureau of Civil Rights on September 22, 2010 at approximately

7:40 a.m. *Id.* at ¶ 62. The "Received By" stamp on each of the complaint forms indicates that IDOT received them on September 22, 2010. *Id.* at ¶ 63. Each document was signed by Civil Rights Officer Lawrence Parish on October 5, 2010. *Id.* at ¶ 64. Fulgenzi and Klemz both contend that they never saw either of Parker's internal complaints or letter prior to Parker's termination on September 21. *Id.* at ¶¶ 70-71.

## II.    ANALYSIS

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Venturelli v. ARC Cmty. Servs. Inc.*, 350 F.3d 592, 598 (7th Cir. 2003) (quoting Fed. R. Civ. P. 56(c)). Summary judgment is also appropriate when "the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) (citing *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995)). In other words, "summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party." *Venturelli*, 350 F.3d at 598.

The plaintiff has brought his suit for intentional discrimination under § 1981, § 1983, and Title VII. However, the analysis for intentional discrimination under each of these statutes is the same. *See Smith v. Bray,* 681 F.3d 888, 899 (7th Cir. 2012) ("In general, the same standards govern intentional discrimination claims under Title VII, § 1981, and § 1983." (citing *Steinhauer v. DeGolier,* 359 F.3d 481, 483 (7th Cir. 2004))); *Williams v. Waste Mgmt. of Ill., Inc.*, 361 F.3d 1021, 1028 (7th Cir. 2004) (stating that § 1981 claims for race-based harassment, discrimination, and retaliation are evaluated under the same rubric as Title VII claims); *Benders v. Bellows and*

*Bellows,* 515 F.3d 757, 768 n.7 (7th Cir. 2008) ("The same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection claims." (citing *Williams v. Seniff,* 342 F.3d 774, 788 n.13 (7th Cir. 2003))). Plaintiff's claim for hostile work environment was alleged solely under Title VII. *See* Am. Compl., ¶¶ 38, 44, ECF No. 6. Accordingly, the Court analyzes each of the plaintiff's claims under the rubric of Title VII.

The defendants argue that they are entitled to summary judgment on Parker's race discrimination claims based on his termination from the Highway Maintainer position on June 9, 2010, and his termination from the TMII position on September 21, 2010, his retaliation claim based on his termination from the TMII position, and his hostile work environment claim based on events that occurred at the ETP facility. In response, Parker argues only that he has sufficient evidence to survive summary judgment on a claim for discrimination based on his termination from the Highway Maintainer position, retaliation for his termination from the TMII position, and for a hostile work environment at the ETP facility.[3] Any other causes of action Parker may have pled, therefore, are forfeited in light of his response. *See, e.g., Seiser v. City of Chi.,* No. 12 C 02353, 2013 WL 1809916, at *3 (N.D. Ill. Apr. 29, 2013) (citing *Palmer v. Marion Ctny.,* 327

---

[3] In his response, Parker argues that "his terminations from IDOT on June 9, 2010 and September 21, 2010 were due to his race because he was repeatedly subjected to numerous racially derogatory comments in connection with adverse employment actions and the Defendants' alleged rationale for his termination was merely pretextual." Pl.'s Resp. 4. However, in the remainder of his brief, Parker only presents argument to support his claim for racial discrimination based on his termination from the Highway Maintainer position on June 9, 2010 under the direct method of proof. *See id.* at 4-7. Accordingly, to the extent that Parker asserts a cause of action for racial discrimination based on his termination from the TMII position on September 21, 2010, that claim is waived. *See e.g., Brandt v. Bd. of Educ. of City of Chi.,* 420 F. Supp. 2d 921, 930 n.2 (7th Cir. 2006) (holding that plaintiff had waived a retaliation claim by failing to respond to the defendants' argument that the claim was without merit) (citing *Estate of Moreland v. Dieter,* 395 F.3d 747, 759 (7th Cir. 2005) ("Perfunctory or undeveloped arguments are waived"); *see also Volovsek v. Wis. Dep't of Agric. Trade & Consumer Prot.,* 344 F.3d 680, 689 n.6 (7th Cir. 2003) (citing *United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir. 1991))).

F.3d 588, 597-98 (7th Cir. 2003) (claims and arguments not presented to a district court in response to a summary judgment motion are deemed abandoned and waived)). That leaves three claims for adjudication: Parker's claim that his termination from the Highway Maintainer position was racially discriminatory, his claim for retaliation based on his termination from the TMII position, and his claim for hostile work environment.

### A. Discriminatory Termination from the Highway Maintainer Position

Intentional discrimination can be proven through either the direct method or the indirect method laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[4] The plaintiff, however, relies exclusively on the direct method. Pl.'s Resp. 3-7, 11-18, ECF No. 75. Under the direct method, the plaintiff may rely on direct evidence, which "if believed by the trier of fact, would prove the fact in question without reliance on inference or presumption." *Venturelli,* 350 F.3d at 599 (internal quotation marks omitted) (citing *Rogers v. City of Chi.,* 320 F.3d 748, 753 (7th Cir. 2003)). "Direct evidence 'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.'" *Id.* (citing *Rogers,* 320 F.3d at 753). As the Seventh Circuit has noted, direct evidence is rare. *See id.* Further, the plaintiff may also adduce circumstantial evidence that creates a "convincing mosaic" of discrimination, which "allows a

---

[4] Under the indirect, burden-shifting method, the plaintiff must first establish a *prima facie* case for discrimination by showing that: "(1) he belongs to a protected class; (2) he performed his job satisfactorily; (3) he suffered an adverse employment action; and (4) his employer treated similarly situated employees outside of his protected class more favorably." *Contreras v. Suncast Corp.*, 237 F.3d 756, 759 (7th Cir. 2001) (citing *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1000-01 (7th Cir. 2000)). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendants to lay out a legitimate, nondiscriminatory reason for their decision to terminate the plaintiff. *See Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 641-42 (7th Cir. 2008) (citing *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 559 (7th Cir. 2007); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006)).). If the defendants do so, the burden then shifts back to the plaintiff, who must produce evidence that the defendants' explanation is pretext for discrimination. *Faas*, 532 F.3d at 641-42 (citing *Barricks,* 481 F.3d at 559; *Ptasznik,* 464 F.3d at 696).

14

jury to infer intentional discrimination by the decisionmaker." *Collins v. Am. Red Cross,* 715 F.3d 994, 1000 (7th Cir. 2013) (citing *Brown v. Advocate S. Suburban Hosp.,* 700 F.3d 1101, 1105 (7th Cir. 2012)). Circumstantial evidence generally takes three forms. *Brown,* 700 F.3d at 1105. "First, the plaintiff[] may show evidence of suspicious timing, ambiguous behavior, statements or comments directed at employees in the protected group, and 'other bits and pieces from which an inference of discriminatory intent may be drawn.'" *Id.* (citing *Phelan v. Cook Cnty.,* 463 F.3d 773, 781 (7th Cir. 2006)). Second, a plaintiff "may provide evidence that 'a similarly situated employee received more favorable treatment.'" *Id.* (citing *Phelan,* 463 F.3d at 781). And third, a plaintiff "may provide evidence that the plaintiff 'was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic, and that the employer's stated reason for the difference in treatment is unworthy of belief," *i.e.,* pretext for discrimination. *Id.* (citing *Phelan,* F.3d at 781).

Plaintiff's brief betrays a misunderstanding of the distinction between the direct method of proving discrimination and "direct evidence" of discrimination. *See* Pl.'s Resp. 3-4 (stating that "direct evidence" proves discrimination claim while arguing that it is inferences drawn from circumstantial evidence that do so). No direct evidence of discrimination or retaliation has been adduced in this case; as the defendants submit, the record before the Court is devoid of direct evidence of discrimination—*i.e,* an admission from one of the defendants that Parker was terminated from the Highway Maintainer position because he is African American in this respect. The absence of direct evidence is not unusual, however, and it is plain that notwithstanding any syntactical confusion, the plaintiff is asserting his discrimination and retaliation claims based on an argument that there is a mosaic of circumstantial evidence of discrimination sufficient to allow a jury to draw a reasonable inference of discrimination.

That said, the circumstantial evidence Parker has adduced is not sufficient to support a jury finding of discrimination. In fact, the only inference the record supports is that the only two named defendants who had any involvement in Parker's employment in the Highway Maintainer position did everything they could to keep Parker employed with IDOT—first by attempting to secure a waiver for the Illinois residency requirement from CMS and then by creating an emergency temporary position and then a permanent position for Parker at the ETP facility. And while Parker argues that "there was no reason why [he] was the only one dismissed out of everyone who was hired" into the Highway Maintainer position, Pl.'s Resp. 5, the uncontested evidence shows that Parker was dismissed because he was an Indiana resident and CMS would not approve his hire or waive the residency requirement. Nothing in the record suggests that this legitimate, nondiscriminatory justification was pretext for discrimination, *i.e.,* "a lie." *Smiley v. Columbia Coll. Chi.,* 714 F.3d 998, 1002 (7th Cir. 2013) (citing *Vaughn v. Vilsack,* 715 F.3d 1001, 1008 (7th Cir. 2013)).

And while the record before the Court has been drawn solely from the defendants' 56.1 statements of fact, the outcome would be the same even if the plaintiff's evidence is taken into consideration. For instance, Parker argues that there are "too many suspect and/or conflicting facts in evidence to support [the defendants'] claim that [their decision] was not based on Parker's race." Pl.'s Resp. 4. First, Parker contends that he was never notified that CMS would not approve his hiring in February, when CMS had initially informed IDOT of its decision. *Id.* at 4-5. According to Parker, had he received prior notification, he never would have tendered his resignation to K-Five Construction on May 25, 2010. *Id.* at 5. Parker also contends that while he was being transferred from the Highway Maintainer position to the emergency temporary position, Fulgenzi and Klemz were giving him "the brush off." *Id.* Parker also argues that his

16

contention is further supported by the fact that none of the defendants had heard of the Personnel Code residency requirement being used by CMS to screen applicants. *Id.* at 5-6.

But none of this evidence, even if supported by the record, is sufficient, either taken separately or as a whole, to raise an inference of intentional discrimination. *See Fleishman v. Cont'l Cas. Co.,* 698 F.3d 598, 603 (7th Cir. 2012) ("[C]ircumstantial evidence…'points directly to a discriminatory reason for the employer's action.'" (citing *Davis v. Con-Way Transp. Cent. Express, Inc.,* 368 F.3d 776, 783 (7th Cir. 2004))). Perhaps IDOT failed to promptly notify Parker that CMS would not approve his hire while they were seeking to obtain a waiver for Parker and, perhaps, Klemz and Fulgenzi gave Parker the brush off while they were securing him an emergency position with IDOT (and eventual permanent employment). Neither of those bits of evidence says anything about the reason for which Parker was terminated in the first place. In fact, as already mentioned, Klemz and Fulgenzi were not involved in Parker's June 9, 2010, termination, but instead had been doing everything in their power to either obtain a waiver for him or secure for him another position at IDOT. Parker's claim that efforts by Klemz and Fulgenzi to keep him employed by IDOT are circumstantial evidence of a discriminatory termination makes no sense.

Further, in an attempt to identify a similarly-situated applicant that was treated more favorably, Parker argues that Carlos Garcia was hired as a Highway Maintainer in June 2010, around the time that Parker was terminated. Pl.'s Resp. 6. Parker also avers, inconsistently, that there were supposedly 42 veteran applicants with an "A" grade, but the position vacated by Parker was never filled after his termination. *Id.* at 6-7. But like the proffered evidence above, this evidence fails to create a genuine dispute as to a material fact. First, Parker has not met his burden of showing that Garcia was similarly situated—meaning, in this case, that Garcia was

neither a resident of Illinois nor African American, Parker's protected classification. *See, e.g.,*

*Winsley v. Cook Cnty.,* 563 F.3d 598, 605 (7th Cir. 2009) ("To meet her burden of demonstrating

that another employee is 'similarly situated,' a plaintiff must show that there is someone who is

directly comparable to her in all material respects." (citing *Patterson v. Avery Dennison Corp.,*

281 F.3d 676, 680 (7th Cir. 2002))). Nor does he offer evidence that no one was hired to fill the

position from which he was terminated; instead, he tells us that he "has kept in touch with

several IDOT employees" who have told him as much. *Id.* at 6. Even if that sort of report

sufficed as evidence to be considered on summary judgment (and it assuredly does not), the fact

that Parker's vacated position was never filled also falls well short of demonstrating that a

similarly situated applicant, comparable to Parker in all material respects but not in his protected

group, was treated more favorably. It is the plaintiff's burden to produce evidence that

demonstrates that an applicant is similarly situated. *See, e.g., Dority v. City of Chi.,* No. 98 C

04893, 2001 WL 1155286, at *14 (N.D. Ill. Sept. 28, 2001) ("[A] plaintiff must provide specific

evidence and specific examples of employees who have been treated more favorably" (citing

*Harris v. SSM Healthcare,* No. 97 C 02121, 1998 WL 704056, at *3 (N.D. Ill. Sept. 13, 1998))).

Further, even as circumstantial evidence, the fact that Parker's position went unfilled, without

more, fails to raise a reasonable inference of racial discrimination. His position may have gone

unfilled for any number of perfectly legitimate or, perhaps even illegitimate, but non-

discriminatory reasons. But the plaintiff has not adduced any evidence on which a trier of fact

could base a reasonable inference that *his* proffered reason—racial discrimination—actually

explains why the position went unfilled.

　　　Nor does the evidence suggest that the justification for Parker's termination was

pretextual. Parker offers no evidence that non-Illinois residents were hired in contravention of

the Personnel Code's residency requirement, and he does not even attempt to explain why Fulgenzi and Klemz would have hired him in the first place only to invoke the residency requirement as a pretext to derail that hiring.[5] In short, Parker has failed to present any direct or circumstantial evidence that his termination from the Highway Maintainer position was racially discriminatory. Accordingly, the defendants' motion for summary judgment on this claim is granted.

### B. Retaliation

Parker also alleges that the defendants retaliated against him for filing his September 7 complaint by terminating his employment from the TMII position. In the context of a retaliation claim, the direct method "requires proof that (1) the employee engaged in statutorily protected activity; (2) [he] suffered an adverse employment action; and (3) a causal link exists between the two." *Majors v. Gen. Elec. Co.,* 714 F.3d 527, 537 (7th Cir. 2013) (citing *Nichols v. S. Ill. Univ.-Edwardsville,* 510 F.3d 772, 784-85 (7th Cir. 2007)). To establish a causal link, the plaintiff must show that his protected activity was a "substantial or motivating factor" in the adverse employment action. *Milligan v. Bd. or Trs. of S. Ill. Univ.,* 686 F.3d 378, 388 (7th Cir. 2012).

The Court first notes that there appears to be a genuine dispute as to whether the defendants had notice of Parker's internal complaints for harassment. If the defendants did not have notice of the complaints, there is no way they could have terminated Parker, or caused some other adverse employment action, in retaliation for those complaints. *See, e.g., Durkin v. City of Chi.,* 341 F.3d 606, 614 n.4 (7th Cir. 2003) (explaining that an employer's knowledge of the plaintiff's statutorily protected activity is implicit in the first element of a *prima facie* claim for

---

[5] Nor is there any evidence that Fulgenzi or Klemz even made the decision to invoke the residency requirement. The unrebutted evidence is that they simply reported to Parker the CMS denial of his application due to his Indiana residency.

retaliation). And of course, the protected activity must have preceded the alleged adverse employment action; the plaintiff's internal complaints could not have been a "substantial or motivating factor" in the decision to terminate him if those complaints were filed after his termination. *See, e.g., Simmons v. Dep't of Cent. Mgmt. Srvs.,* No. 02 C 09492, 2004 WL 2584801, at *6 (N.D. Ill. Nov. 10, 2004) ("Defendant could not have retaliated against Plaintiff for filing a charge that Plaintiff had not yet filed and that Defendant did not know she intended to file the charge."). To that end, the defendants aver that Parker's complaints were faxed to IDOT's Bureau of Civil Rights on September 22, 2010, the day after Parker's termination. Defs.' Mem. Supp. Summ. J. 9. According to the defendants, Parker did not file his complaints until that time and Klemz, Fulgenzi, and Schivarelli were not aware of Parker's complaints prior to his termination. *Id.* Therefore, the defendants argue, Parker's claim must fail.

Parker, on the other hand, argues that it can be reasonably inferred that he attached his September 7 complaint and letter to his September 21, 2010 internal complaint for retaliation before faxing them to IDOT's Bureau of Civil Rights, but had filed them earlier, and that there is at least a genuine issue of material fact regarding the defendants' notice of those complaints prior to his termination. Pl.'s Resp. 10-11. All of that said, even if the defendants had notice of Parker's internal complaints, the point is effectively moot because Parker has failed to show that his complaints constituted statutorily protected activity.

As the Seventh Circuit has explained, "[a]lthough filing an official complaint with an employer may constitute statutorily protected activity under Title VII, the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class." *Tomanovich v. City of Indianapolis,* 457 F.3d 656, 663 (7th Cir. 2006) (citing *Gleason v. Mesirow Fin., Inc.,* 118 F.3d 1134, 1147 (7th Cir. 1997)). "Merely complaining in general terms

of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Id.* (citing *Gleason,* 118 F.3d at 1147 (holding that the plaintiff's general complaint about management style without raising the subject of sexual harassment fails to constitute protected activity); *Sitar v. Ind. Dep't of Transp.,* 344 F.3d 720, 727 (7th Cir. 2003) (affirming the district court's grant of summary judgment to the employer on the plaintiff's retaliation claim because the plaintiff's complaint to his employer "did not invoke any action protected by Title VII"); *Miller v. Am. Fam. Mut. Ins.,* 203 F.3d 997, 1008 (7th Cir. 2000) (holding that the plaintiff did not engage in a protected activity where "[h]er complaints instead concerned a general displeasure with being paid less than her co-workers given her longer tenure and the fact that she had trained some of them" and not discrimination related to a protected class)).

Here, Parker's internal complaints to IDOT and his letter to his union fail to allege that he was being harassed based on his race. His letter to Local 916 contains not a whiff of complaint regarding racial harassment; it simply recounts in detail an occasion on which defendant Thorpe intervened to deny Parker an opportunity for overtime as gas man, which Parker attributed not to racial discrimination but to Thorpe's attitude that "by him being a for[e]man gives him the right to mistreat me at will." Defs.' 56.1 Stmt., Ex. 36, at 8. Parker's IDOT complaints similarly lack any allegation of racial harassment. On neither form did Parker check the box provided to indicate racial harassment, and indeed on the first form, dated September 7, 2010, Parker marked the box "other," and wrote in "harassment," plainly suggesting that the "harassment" about which he was complaining was not racial harassment. Defs.' 56.1 Stmt., Ex. 30. Consistent with that interpretation, the brief narrative description of the problem Parker provided on the first

form complains only that Thorpe called him a "bitch" on three occasions; the second complaint simply asserted that he had been retaliated against for filing the first. *Id.*

Parker avers that the term "bitch" has racially derogatory connotations, but he provides no support for that contention.[6] Certainly the term has offensive connotations in the context of gender, *see Passananti v. Cook Cnty.,* 689 F.3d 655, 665-66 (7th Cir. 2012), but the plaintiff has provided (and the Court has found) no indication that the term is used as a racial epithet. Perhaps not surprisingly, the Oxford English Dictionary does not offer any definition of the word suggesting that it may have racial connotations, but neither does the Online Slang Dictionary (www.onlineslangdictionary.com; last visited October 24, 2013), a source offering so many slang uses of the word that it is almost inconceivable that usage of the term as a racial epithet at any level of ubiquity would have escaped its attention.

The point is not that Parker did not really understand Thorpe's use of the term as racially derogatory, or that no one has ever used the word bitch as a racial epithet, but that there is an inadequate objective basis to consider use of that term to be a racial epithet. That is particularly true where the context in which the term was used strongly suggests an alternative usage that, while offensive, is not racial in character. As the Seventh Circuit has recognized, "[c]alling a man a 'bitch' belittles him precisely because it belittles women. It implies that the male object of ridicule is a lesser man and feminine, and may not belong in the workplace." *Passananti,* 689

---

[6] Parker points out—unnecessarily—that he testified that he believed Thorpe was capable of discriminating against him even though Thorpe was also African American and that Thorpe did not like African Americans. Pl.'s Resp. 12. That Thorpe was also African American does not undermine Parker's claim. *See, e.g., Williams v. Wendler,* 530 F.3d 584, 587 (7th Cir. 2008) ("there can … be … 'racial' discrimination within the same race"); *Doe by Doe v. City of Belleville, Ill.,* 119 F.3d 563, 580 n.13 (7th Cir. 1997) ("plaintiff is not barred from asserting racial discrimination simply because the person whom she contends was responsible for the discriminatory action was of the same race."), *abrogated on other grounds by Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75 (1998).

F.3d at 666 (quoting *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 813 (11th Cir. 2010) (*en banc*)). That is precisely the context in which the record shows Thorpe to have used the term; Parker's Local 916 letter expressly complained that Thorpe had "belittle[d] me" and his deposition testimony confirmed that the gist of his complaints was that he was harassed not because of his race but because of his job title and union status. Defs.' 56.1 Stmt., Ex. 36, at 8; *See, e.g.,* Defs.' 56.1 Stmt., Ex. 7.2 (Parker's Dep.) at 122:20-24 ("Because—in other words, when I say I had no title, I wasn't considered a permanent employee there, so because I wasn't considered that, they treated me as if I was nobody."); *Id.* at Ex. 7.3, 127:10-13 ("I wasn't— because I wasn't highway maintainer, ETP, and I wasn't considered Local 700, I was nothing to them. And they would sit and point at me and laugh. And they did that consistently."). In that light, Thorpe's use of the term "bitch" comports with a common usage: to belittle or suggest a subservient relationship.

Parker may now believe and aver that the term "bitch" had racial connotations as it was used by Thorpe. But Parker's "subjective beliefs," without more, "are insufficient to create a genuine issue of material fact" as to this element of his retaliation claim. *See, e.g., Hanners v. Trent,* 674 F.3d 683, 694 (7th Cir. 2012) (citing *McMillian v. Svetanoff,* 878 F.2d 186, 190 (7th Cir. 1989)). Even taking the plaintiff's evidence into consideration, there is no basis from which a jury could reasonably infer that the defendants understood Parker to be complaining of racial harassment in the complaints he lodged on September 7, and accordingly there is no basis to infer that he was discharged in retaliation for lodging complaints of racial harassment. *See, e.g., Tomanovich,* 457 F.3d at 664 (holding that general complaints of harassment or discrimination, without facts sufficient to create an inference that the harassment or discrimination was based on

a protected class, is insufficient to show that the plaintiff engaged in statutorily protected activity).

Parker also argues that Lloyd Hinton, another employee at the ETP facility, testified that he "heard Thorpe use the 'N' Word to address Parker a lot." Pl.'s Resp. 13; Pl.'s 56.1 Stmt. No. 43. That assertion is not entirely accurate. Hinton testified that Thorpe "throws that around a lot," but his testimony did not establish that Thorpe frequently directed the term toward Parker.[7] Nor is there any record evidence that Parker was aware of any such comments during his employment. Parker himself has not alleged or claimed that Thorpe ever used that term and Parker never lodged any complaint about the use of the "n word" by Thorpe or anyone else.

In any event, the inquiry in the context of Parker's retaliation claim is not whether Thorpe used the "n-word," either generally or in reference to the plaintiff, but whether Parker filed internal complaints alleging that he was being subjected to discrimination and harassment motivated by his race, thereby engaging in statutorily protected activity. Neither of Parker's complaints, nor his letter to his local union, references or alleges that Thorpe had called the plaintiff the "n-word" or had even used the "n-word" more generally. There is simply no evidence, even taking the plaintiff's facts into consideration, to support an inference that Parker's complaints were based on racial discrimination.

Because Parker has failed to marshal sufficient evidence to support a reasonable inference that he engaged in statutorily protected activity, his claim for retaliation fails as a matter of law. The Court, therefore, does not need to address the causation of element of his

---

[7] Hinton testified: "Q. Did you ever hear any racial comments made to Mr. Parker? A. As far as like the N word, I heard that. Like I said, he throws that around a lot." Pl.'s 56.1 Stmt. No. 43, Ex. H (Hinton Dep. at 82:22 – 83:1).

claim (*i.e.*, the question of whether IDOT's termination of Parker was prompted by concern about safety at the facility in the wake of Parker's warning that "something was going to happen" at the facility or by the September 7 complaint and letter to Local 916). The defendants' motion for summary judgment on the retaliation claim is granted.

### C. Hostile Work Environment

Parker also alleges that he was subjected to a hostile work environment at the ETP facility based on or motivated by his race. Pl.'s Resp. 19-20. "In seeking to establish the existence of a hostile work environment, [the] plaintiff[] must show that [his] work environment was both objectively and subjectively offensive—that is, 'one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Ellis v. CCA of Tenn. LLC,* 650 F.3d 640, 647 (7th Cir. 2011) (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998)). "To survive summary judgment on a hostile work environment claim," Parker must demonstrate that there are material issues of fact as to whether: "(1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of [his] work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability." *Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004) (citing *Williams,* 361 F.3d at 1029); *see also Mason v. S. Ill. Univ. at Carbondale,* 233 F.3d 1036, 1043 (7th Cir. 2000)). For many of the reasons already mentioned, this claim also fails for lack of evidence.

Parker argues that he was subjected to a hostile work environment because Thorpe had called him a "bitch" on three occasions and because Parker complained about this treatment. Pl.'s Resp. 19-20, but as explained above, Parker has not adduced any circumstantial evidence,

beyond his subjective beliefs, to support an inference that being called a "bitch" by Thorpe had racially derogatory connotations.

Even if these incidents sufficed as evidence of racial harassment, they would still fall well short of conduct so severe or pervasive that it altered Parker's conditions of employment. Indeed, Parker barely attempts to demonstrate this element of his claim. To show that this harassment was severe or pervasive, Parker only argues that he reported Thorpe's conduct to Schivarelli, Foley, and Chiarugi, filed a four-page complaint with Chiarugi, and filed the September 7, 2010 internal complaint, none of which, as previously noted, complained about the use of the "n-word." Pl.'s Resp. 20. Parker's complaints may demonstrate that the alleged harassment was unwelcome under the first element of his claim, but these facts say nothing about the severity or pervasiveness of the harassment, let alone whether the harassment altered his conditions of employment.

Even considering the testimony of others who heard Thorpe refer to Parker using the "n-word" does nothing to bolster the hostile work environment claim because there is no evidence that Parker was aware of those comments. *See Smith,* 388 F.3d at 566 (plaintiff failed to demonstrate a hostile work environment where she had "never personally heard [the defendant] utter the [n-]word" and only heard the defendants refer to other employees using racially derogatory terms on one occasion). Parker notes that Lloyd Hinton, an Emergency Traffic Patrolman with IDOT, testified that Thorpe threw the "n-word" around a lot, and used it once in reference to Parker (Pl.'s Resp. 20), but Parker himself did not cite Thorpe's use of the "n-word" as a basis of his complaints, and he never testified or claimed that he was aware of Thorpe's use of the term. Hinton's testimony goes to his own subjective experience of Thorpe's use of the word; it says nothing about Parker's subjective experience—the critical inquiry in this claim.

Moreover, while "[r]eferring to colleagues with such terms … is in fact deplorable … the mere utterance of an … epithet which engenders offensive feelings in an employee is not sufficient to establish a hostile work environment." *Id.* at 566-67 (citations omitted). "The Seventh Circuit has also noted that offensive statements made outside a plaintiff's presence, even if accompanied by 'a few [offensive] statements made directly to him,' do not constitute 'harassment [that is] so severe or pervasive that it alters the conditions of the plaintiff's employment." *Golden v. World Sec. Agency, Inc.,* 884 F. Supp. 2d 675, 687 (N.D. Ill. 2012) (citing *Thompson v. Mem. Hosp. of Carbondale,* 625 F.3d 394, 401 (7th Cir. 2010)); *see also Whittaker v. N. Ill. Univ. et al.,* 424 F.3d 640, 645 (7th Cir. 2005) ("[A]n objectively hostile work environment will not be found where most of the conduct that forms the basis of a plaintiff's claim consists of derogatory statements made by supervisors or co-workers out of [the plaintiff's] hearing, and the rest is isolated and not particularly severe."); *Ford v. Minteq Shapes and Srvs., Inc.,* 587 F.3d 845, 848 (7th Cir. 2009) ("Title VII is 'not…a general civility code' and will not find liability based on the 'sporadic use of abusive language.'" (citation omitted)).

At bottom, there is no record evidence that the alleged harassment of which Parker complained was racial in character or that it was so pervasive or severe that it effectively altered the conditions of his employment. Accordingly, the defendants' motion for summary judgment as to that claim is granted.

\*      \*      \*

As set forth above, Parker has failed to adduce sufficient evidence to survive summary judgment on his claims for racial discrimination, retaliation, and hostile work environment. Accordingly, the defendants' motion for summary judgment is granted in its entirety.

27

Entered: October 29, 2013

John J. Tharp, Jr.
United States District Judge